IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

FILED BY _____ D.C.

05 OCT 26  PM 3: 50

THOMAS V. GOULD
CLERK, US. DISTRICT COURT
W/D OF TN. MEMPHIS

FREDDIE L. MOORE,

    Plaintiff,

v.                                                      No. 04-2416 B

TOYS-R-US DELAWARE, INC.,
c/o JON JAY ASSOCIATES INC., et al.,

    Defendant.

---

ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

INTRODUCTION AND PROCEDURAL BACKGROUND

On June 2, 2004, the Plaintiff, Freddie L. Moore, initiated this action against the Defendant,

Toys-R-Us Delaware, Inc. c/o Jon Jay Associates, Inc. ("Toys-R-Us"), alleging racial discrimination

and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §

2000e, et seq.; 42 U.S.C. §§ 1981, 1985 and 1986; the Tennessee Human Rights Act (the "THRA"),[1]

Tennessee Code Annotated § 4-21-101 et seq.; and Tennessee common law.  Moore amended his

complaint on September 10, 2004, adding as Defendants Doug Bell and Diana Lukash, employed

by Toys-R-Us as district manager and loss prevention supervisor, respectively.  In an order entered

---

[1] The Plaintiff's THRA claim is to be analyzed in the same manner as the Title VII claim.
As the Tennessee Supreme Court has noted, "[a]lthough the language differs slightly, it is clear
that the legislature intended the THRA to be coextensive with federal law. We, therefore, may
look to federal interpretation of Title VII for guidance in enforcing our own anti-discrimination
statute." Phillips v. Interstate Hotels Corp. No. L07, 974 S.W.2d 680, 683-84 (Tenn. 1998)
(internal citation omitted); see also Reed v. Cracker Barrel Old Country Store, Inc., 133
F.Supp.2d 1055, 1075-76 (M.D. Tenn. 2000).  Similarly, actions brought under § 1981 are
subject to the same analysis as those initiated under Title VII.  Noble v. Brinker Int'l, Inc., 391
F.3d 715, 720 (6th Cir. 2004), cert. denied, ___ S.Ct. ___, 2005 WL 2413978, 73 U.S.L.W. 3720
(U.S. Oct. 3, 2005) (No. 04-1626).

This document entered on the docket sheet in compliance
with Rule 58 and/or 79(a) FRCP on 10 - 27-05



February 11, 2005, this Court granted the motion of the Defendant to dismiss the Plaintiff's claims

under 42 U.S.C. §§ 1985 and 1986, and for outrageous conduct.  In the instant motion, the Defendant

seeks summary judgment as to the Plaintiff's remaining claims pursuant to Rule 56 of the Federal

Rules of Civil Procedure.

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure, which  states in pertinent part that a

> . . . judgment . . . shall be rendered forthwith if the pleadings, depositions, answers
> to interrogatories, and admissions on file, together with the affidavits, if any, show
> that there is no genuine issue as to any material fact and that the moving party is
> entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91

L.Ed.2d 265 (1986); Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc., 862 F.2d 597, 601 (6th

Cir. 1988).  In reviewing a motion for summary judgment, the evidence must be viewed in the light

most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475

U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).  When the motion is supported by

documentary proof such as depositions and affidavits, the nonmoving party may not rest on his

pleadings but, rather, must present some "specific facts showing that there is a genuine issue for

trial." Celotex, 477 U.S. at 324, 106 S.Ct. at 2553.  It is not sufficient "simply [to] show that there

is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., 475 U.S. at 586,

106 S.Ct. at 1356.  These facts must be more than a scintilla of evidence and must meet the standard

of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving

party is entitled to a verdict. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505,

2512, 91 L.Ed.2d 202 (1986).  The "judge may not make credibility determinations or weigh the

evidence." <u>Adams v. Metiva</u>, 31 F.3d 375, 379 (6th Cir. 1994).

FACTS

Moore, a black male, was employed by the Defendant as a manager from late 2000 until January 2004. (Mem. in Supp. of Def.'s Mot. for Summ. J., Ex. 1 (Dep. of Freddie L. Moore ("Moore Dep.") at 36, 82 & Ex. 2 (Pl.'s Resp. to Def. Toys "R" Us' First Set of Interrogs ("Def.'s Interrogs.") at 2.))) In early April 2003, he complained to the store director, Myron Green, about a below average evaluation, which he did not believe he deserved. (Moore Dep. at 99.) Green told him he did not agree with the rating and, as he had felt incompetent to evaluate Moore on his own, had asked Robbie West to assist him. Green advised Moore that the evaluation score was given because the Plaintiff "didn't play politics." (Moore Dep. at 100.) The Plaintiff took the evaluation to District Manager Charles Bell, who crumpled it in his hands and did nothing more about it. (Moore Dep. at 104; Def.'s Interrogs. at 3.)

The Plaintiff also complains that he was denied transfers to store locations with high volume sales. (Moore Dep. at 105.) He related that he was employed at store number 8867 and then left to assist with the closing of another store location. Moore returned to 8867 for 45 days in order to fill in for another employee, after which he went on vacation. (Moore Dep. at 105, 109.) While he was away, he received a telephone call informing him that he was being transferred to store number 8839. (Moore Dep. at 105.) He immediately communicated his objections to Bell on the grounds that 8839 was a lower volume store and had a reputation for "racial incidents." (Moore Dep. at 106.) Specifically, the Plaintiff had heard from fellow employees that Green called black workers at 8839 "niggers" and that there were issues about black customers being treated unfairly. (Moore Dep. at

3

111-13.)  Ruby Armstrong[2] also recalled that racial incidents, including discrimination of black employees and managers, occurred with some frequency at the 8839 store.  (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. and Mem. of Law in Supp. of Summ. J., Ex. 3 (Dep. of Ruby Armstrong ("Armstrong Dep.") at 78-79; Armstrong Aff. at ¶ 8.)  According to Bell, the other choice for the position at 8839 was Amanda Quinn, a white female with less experience and seniority than Moore.  He contended that he did not want to transfer her because this was her first job and he did not think she could handle the 8839 location.  (Bell Dep. at 96.)

Moore recalled that Bell told him that he was qualified for the position and that, while he "recognized the issues," the Plaintiff "was the one that pretty much had to take" the transfer.  (Moore Dep. at 109.)  In Moore's opinion, the manner in which the transfer was communicated to him didn't follow "common courtesy due process."  (Moore Dep. at 107-08.)  He acknowledged, however, that it was not company policy to permit managers to dictate to the company where they were to work.  (Moore Dep. at 108.)  Although Moore would have liked to have transferred to 8867, he basically just wanted to go to any higher volume store, as managers of such locations were more likely to receive higher bonuses.  (Moore Dep. at 120; Def.'s Interrogs. at 11.)  The Plaintiff insisted that he "constantly" requested a transfer, but did not do so in writing and could not remember the dates the requests were made.  (Moore Dep. at 121.)  Bell denied that Moore ever actually asked for a transfer to another store, recalling only that he protested the move to 8839.  (Bell Dep. at 114.)  Green remembered that Moore was "very opinionated" and expressed those opinions to management.

---

[2]According to her affidavit, Armstrong was, during her five-year tenure at Toys-R-Us, seasonal hiring manager, sales associate and customer service representative.  (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. and Mem. of Law in Supp. of Summ. J., Ex. 21 (Aff. of Ruby Armstrong ("Armstrong Aff.") at ¶ 3.)

(Mem. in Supp. of Def.'s Mot. for Summ. J., Ex. 3 (Dep. of Myron Eugene Green ("Green Dep.") at 110.)

The Plaintiff has also alleged that white managers with less seniority were placed at the 8867 store and received pay raises while he did not, mentioning specifically three managers named Amy,[3] Amanda (Quinn) and Scott (Jackson). (Moore Dep. at 122-24.) When pressed in his deposition, however, he admitted that he had not seen their evaluations and did not know the amounts of their raises. (Moore Dep. at 125.) Moreover, he related that he had above average evaluations prior to transferring to 8839 and that he received raises on the basis of those evaluations. (Moore Dep. at 125.)

In his deposition, Moore referred to an incident during the Christmas season where a customer was verbally abusing two black female employees because they did not know the whereabouts of an XBox she had been told was ready for pick up. (Moore Dep. at 136-37.) When he tried to intervene, the customer began calling the employees "niggers." (Moore Dep. at 137-38.) Moore voided the sale to the woman and went to Green's office to explain what was going on on the sales floor. Green suggested that he keep calm and try to get her to leave, offering to call for a security guard. (Moore Dep. at 138.) Green then instructed William Phelps to get the customer a seat and some water. (Moore Dep. at 139.) When Moore asked Green what he was doing by catering to an offensive customer, Green told him to "just leave the building." (Moore Dep. at 140.) Green further advised the Plaintiff that he had handled the situation incorrectly and that he should "grow a thicker skin and get over it." (Moore Dep. at 145.)

---

[3]The Plaintiff concedes in his deposition that he had less seniority than this employee, but claimed he was better qualified.

On or about January 1, 2004, the Plaintiff, while working at 8839, noticed that four copies of the DVD *Underworld* had been delivered to the store. (Moore Dep. at 75, 83.) The "release date" or "street date" of the film, that is, the first date the movie could be sold, was January 6, 2004. (Moore Dep. at 41, 75.) It is undisputed that Moore was familiar with a Toys-R-Us policy that DVDs, tapes or games were not to be sold or removed from the store prior to the release date. (Moore Dep. at 41.) The release date was located on the box. (Moore Dep. at 41.) The reason for the policy was that retailers could suffer severe fines for early release in violation of the posted release date and could lose their ability to obtain new releases. (Mem. in Supp. of Def.'s Mot. for Summ. J., Ex. 2 (Dep. of Charles Douglas Bell ("Bell Dep.") at 23.) Moore could not recall actually reading the policy anywhere but, rather, became aware of it through word of mouth. (Moore Dep. at 41-42.) Nonetheless, he insisted that it was standard practice throughout his tenure for Toys-R-Us employees, including managers, to take videos, movies and games prior to the release date. (Moore Dep. at 44.) He named specifically Green, Lonnie Parker, Cheryl Johnson, West, William Phelps, Betty Flowers, Pam Moore, Darrell Darr and Armstrong. (Moore Dep. at 48-49, 51.) Co-worker Larry Daniel also testified in his deposition that, during his seasonal work at Toys-R-Us, he was aware that other employees purchased movies prior to the release date and were not punished. (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. and Mem. of Law in Supp. of Summ. J., Ex. 2 (Dep. of Larry Arnold Daniel, Jr. ("Daniel Dep.") at 39-41.) Green, Darr and Phelps are white and Moore, Johnson and Flowers are black. (Pl.'s Mem. of Law in Opp'n to Def.'s Mot. and Mem. of Law in Supp. of Summ. J., Ex. 20 (Def.'s Resp. to First Set of Interrogs. at 5; Pl.'s Mem. of Law in Opp'n to Def.'s Mot. and Mem. of Law in Supp. of Summ. J. at 24.) The Court lacks information as to the ethnicity of the remaining individuals named.

6

On January 1, 2004, the Plaintiff decided to buy the movie early, not because others did it, but because it "was available at this particular time" and he didn't have time to get to Target, where he usually purchased movies. (Moore Dep. at 78.) He paid for it with a check written January 1, 2004 in the amount of $20.00 and placed the check in the pocket of his Toys-R-Us shirt. (Moore Dep. at 79-80.) The shirt was left in the training room where he always kept his uniform. (Moore Dep. at 80.) Apparently, Moore asked Green to hold the movie for him along with a second copy for Daniel, who had given him a $20.00 bill, which Moore also placed in his shirt pocket. (Moore Dep. at 81.) The Plaintiff, who at that time was the store's sales floor manager, recalled that he was working in the storeroom with Green on January 1 and told Green that he and Daniel wanted the movies. Green said it was okay and the two asked Darr to pull two copies and keep them at the customer service desk for the Plaintiff and Daniel. (Moore Dep. at 82-83; Green Dep. at 31.) Moore told Green that the money for the DVDs would be in his uniform shirt pocket in the training room. (Moore Dep. at 83.) It was Moore's intention that Green would retrieve the money from the pocket. (Moore Dep. at 83.)

The Plaintiff recalled that a day or two later it was discovered that two of the four DVDs received by the store were missing and Diana Lukash, the Defendant's loss prevention supervisor, was notified. (Moore Dep. at 83; Def.'s Interrogs. at 3.) By that time, Moore had taken his copy home. (Moore Dep. at 89.) He acknowledged that in doing so he violated the company's policy. (Moore Dep. at 89.) The money to pay for the movies was eventually given to Toys-R-Us. (Moore Dep. at 81-82, 96.) He specifically admitted to Diana Lukash that he had violated the policy on taking DVDs from the store prior to the release date. (Moore Dep. at 74.) The Plaintiff was terminated but denied knowing why or if taking the DVD prompted the action. (Moore Dep. at 74.)

7

Moore stated that he was told he had "failed to follow protocol," "set a bad example for the associates," and "violated company policy." (Moore Dep. at 97.) He did not ask which company policy he had violated. (Moore Dep. at 97.) Moore avers that he was fired by both Bell and Lukash.[4] (Def.'s Interrogs. at 3.) In his answers to interrogatories propounded by the Defendant, the Plaintiff submits that he was terminated because he violated the policy prohibiting taking videos from the store prior to the release date. (Def.'s Interrogs. at 3.) Green was also fired for failure to follow company policy and for interfering with the loss prevention investigation. (Bell Dep. at 18.) It is the Plaintiff's position in this lawsuit that (1) he was terminated because of his complaints about the below average evaluation and racism, not the taking of a movie in violation of company policy and (2), assuming he was fired for violating the policy, other similarly situated employees engaged in the same behavior and were not terminated. He further claims that, according to other employees, including Green, he was replaced by Jackson, a white male. (Moore Dep. at 131.) It was Armstrong's opinion that Jackson was "not good" and "not bad," and that he lacked experience, while Moore was articulate and professional, had excellent customer relations skills, and was an asset to the company. (Armstrong Dep. at 91; Armstrong Aff. at ¶ 9.)

Bell testified that Jackson was brought on board in September 2002. He trained at 8867 and was later transferred to 8839 to fill a management opening. (Bell Dep. at 102.) At that point he was in an equivalent position with Moore. (Bell Dep. at 102.) It was Bell's assertion that Moore was replaced not by Jackson but by Gail Hawksworth, a white female, in May 2004. (Bell Dep. at 124.) Jackson, he contended, replaced Green and performed Moore's duties until the hiring of

---

[4]No action was taken against Daniels, who, as a seasonal employee, was no longer working for the Defendant at the time of the investigation. (Bell Dep. at 41, 43.)

Hawksworth. (Bell Dep. at 125.) Bell further stated that he directed Green to place documentation in the files of both Moore and a pregnant black employee concerning a heated argument involving the two in front of customers. (Bell Dep. at 141, Green Dep. at 67.) Apparently, Green did not carry out the directive because he did not believe it was warranted. (Bell Dep. at 141, Green Dep. at 66.) Green's affidavit, which he claims he did not author, referred to this incident by stating that "[a]fter April 1, 2003, when Mr. Moore complained to management about his below-average evaluation report, [Green] was directed by the District Manager, Doug Bell to begin placing unwarranted and undeserved reprimands in Mr. Moore's personnel file in order to provide a basis for terminating Mr. Moore." (Green Dep., Ex. 1 (Aff. of Myron Green) at ¶ 4.) He denied in his deposition that he in fact ever placed unwarranted and undeserved reprimands in Moore's file. (Green Dep. at 70.) Green also denied in his deposition that he was instructed by Bell to place a reprimand in the file to create a basis to terminate Moore. (Green Dep. at 72.) He was aware that Bell himself had placed a reprimand in Moore's file concerning a separate incident in which he closed a refund register before the store closed. (Green Dep. at 70.) According to Armstrong, however, other black employees had closed registers early with no repercussions. (Armstrong Dep. at 80.) Green suspected that he was terminated at least in part because Bell was angry at him for not placing the undeserved reprimands in Moore's file as he had requested. (Green Dep. at 99.)

According to Lukash, her investigation of the alleged theft of the DVDs revealed that two had been placed on hold by Moore and that Green gave him permission to do so. (Mem. in Supp. of Def.'s Mot. for Summ. J., Ex. 4 (Dep. of Diana Lukash ("Lukash Dep.") at 13.) She questioned Green as to whether they had been paid for and he responded that he had a check from Moore for the purchase amount. (Lukash Dep. at 13.) It was her testimony that, on a second visit to the store,

she "was passing through to pick up the check and had a discussion with Myron [Green] at that time. And he said that he did not have the check, that he was mistaken. He basically was lying that he had the check in his possession to begin with. And when I got there, there was no check to be had at all." (Lukash Dep. at 13.) It was her opinion that he was trying to cover up for Moore. She further stated that she "spoke with Freddie about the DVDs when they were removed from the store. He claimed he had left a check in the store in his shirt pocket, I believe he stated in his statement, in the training room, locked up in the training room. The DVDs were removed from the store without the check being properly processed prior to the release date. Basically, that's it in a nutshell." (Lukash Dep. at 25.) It was her recollection that Bell was the one who fired the Plaintiff, although she was present. (Lukash Dep. at 25.) The reason for the termination was, according to Lukash,

> violation of our hold policy. He didn't hold the merchandise properly. He didn't pay for the merchandise prior to removing the merchandise from the building. And he violated the street date. The check was written out for 1/1, but the items were removed from the building before New Years. So it was like the 30th when they were removed from the building. So days passed after that check was written.

(Lukash Dep. at 26.)

## ANALYSIS OF THE PARTIES' CLAIMS

Title VII prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race. . ." 42 U.S.C. § 2000e-2(a)(1). Disparate treatment as posited by the Plaintiff "occurs when an employer treats some employees less favorably than others because of race, religion, sex, or the like." Huguley v. General Motors Corp., 52 F.3d 1364, 1370 (6th Cir. 1995). Moore may withstand the motion for summary judgment either by presenting direct evidence of discrimination or by presenting circumstantial evidence, utilizing the evidentiary framework set forth in McDonnell Douglas Corp.

v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and Texas Dep't of Community

Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), from which a jury could

draw an inference of discriminatory motive. See Seay v. Tennessee Valley Auth., 339 F.3d 454, 463

(6th Cir. 2003).

> With respect to direct evidence, the Sixth Circuit has explained as follows:
>
> Where a plaintiff presents direct evidence of discriminatory intent in connection with
> a challenged employment action, the burden of both production and persuasion shifts
> to the employer to prove that it would have terminated the employee even if it had
> not been motivated by impermissible discrimination.  This court has explained that
> direct evidence is that evidence which, if believed, requires the conclusion that
> unlawful discrimination was at least a motivating factor in the employer's actions.
> Consistent with this definition, direct evidence of discrimination does not require a
> factfinder to draw any inferences in order to conclude that the challenged
> employment action was motivated at least in part by prejudice against members of
> the protected group.

Johnson v. Kroger Co., 319 F.3d 858, 865 (6th Cir. 2003), reh'g and suggestion for reh'g en banc

denied (Apr. 22, 2003) (internal citations and quotation marks omitted).  Thus, upon a showing by

a plaintiff of credible direct evidence of discriminatory animus, the employer must "do more than

merely 'articulate' its nondiscriminatory reason for its action."   Brack v. Shoney's, Inc., 249

F.Supp.2d 938, 947 (W.D. Tenn. 2003).

Where direct evidence is not available, as is often the case in employment discrimination

cases, a plaintiff may, utilizing the McDonnell Douglas/Burdine analysis, create an inference of

discrimination based on introduction of evidence supporting a prima facie case of racial

discrimination, that is:  "(1) he was a member of a protected class; (2) he suffered an adverse

employment action; . . . (3) he was qualified for the position from which he was discharged" and (4)

that he "was either replaced by someone outside the protected class or treated differently than

similarly situated, non protected employees." Noble, 391 F.3d at 728. Once the plaintiff has established a prima facie case of discrimination, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for its actions. McDonnell Douglas Corp., 411 U.S. at 802, 93 S.Ct. at 1824. If the employer carries its burden of production, the presumption raised by the plaintiff's prima facie case is rebutted. A plaintiff must then prove, by a preponderance of the evidence, that the employer's stated reasons for the employment action were a pretext for discrimination. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 518-19, 113 S.Ct. 2742, 2753-54, 125 L.Ed.2d 407 (1993). A plaintiff may show pretext by presenting evidence that the defendant's stated reason had no basis in fact, did not actually motivate the decision or was not sufficient to motivate the employer's action. See Manzer v. Diamond Shamrock Chem. Co. 29 F.3d 1078, 1084 (6th Cir. 1994), reh'g and suggestion for reh'g en banc denied (Sept. 22, 1994). The ultimate burden of persuasion remains at all times with the plaintiff. Burdine, 450 U.S. at 253, 101 S.Ct. at 1093.

In order to prevail on a claim of retaliation, a plaintiff must demonstrate that (1) he was engaged in activity protected by Title VII; (2) his actions were known to the defendant; (3) subsequently, the employer took action adverse to the plaintiff; and (4) there was a causal connection between the plaintiff's activity and the actions of the defendant. Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000).

Contrary to the arguments of the Plaintiff, the Court does not find that the actions alleged constitute the type of direct evidence which renders the McDonnell Douglas paradigm inapplicable. Accordingly, the Court turns its focus to the question of whether Moore has established a prima facie case of discrimination based on circumstantial evidence.

It is undisputed that Moore is a member of a protected class, that he suffered an adverse

12

employment action, and that he was qualified for the position he held at the time of his termination. Viewing the evidence presented in the light most favorable to the Plaintiff, evidence has also been submitted to establish that he was replaced by a white employee and/or that he was treated differently from white employees who were similarly situated. The Defendant has offered a legitimate, non-discriminatory reason for his discharge, that is, theft of the *Underworld* DVD in violation of company policy. In response, the Plaintiff has proffered evidence to suggest that the reason identified by Toys-R-Us was pretextual in the form of deposition testimony, as outlined above, to the effect that the unwritten policy was widely violated with the knowledge of management and that other employees were not punished. Thus, summary judgment on the issue of racial discrimination is not appropriate. The Defendant's attempt to dispose of Moore's retaliation claim at this stage must also suffer the same fate, as the Plaintiff has offered evidence which, if believed, would tend to show that adverse employment actions taken against him by his employer resulted from his complaints of racial animus over a period of time leading up to the ultimate termination.

<u>CONCLUSION</u>

For the reasons articulated herein, the Defendant's motion for summary judgment is hereby DENIED.

IT IS SO ORDERED this 24th day of October, 2005.

J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

UNITED STATES DISTRICT COURT - WESTERN DISTRICT OF TENNESSEE



# Notice of Distribution

This notice confirms a copy of the document docketed as number 45 in case 2:04-CV-02416 was distributed by fax, mail, or direct printing on October 27, 2005 to the parties listed.

---

Thomas L. Henderson
LEWIS FISHER HENDERSON & CLAXTON, LLP
6410 Poplar Ave.
Ste. 300
Memphis, TN 38119

Melissa Kimberly Hodges
LEWIS FISHER HENDERSON CLAXTON & MULROY
6410 Poplar Ave.
Ste. 300
Memphis, TN 38119

Venita Marie Martin
GLANKLER BROWN, PLLC
One Commerce Square
Suite 1700
Memphis, TN 38103

Van Davis Turner
GLANKLER BROWN
One Commerce Sq.
Ste. 1700
Memphis, TN 38103

Honorable J. Breen
US DISTRICT COURT